FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Aug 21, 2025

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CHELSEA B.,[1] <br><br>            Plaintiff, <br><br>     v. <br><br> FRANK BISIGNANO, <br> Commissioner of Social Security,[2] <br><br>           Defendant. | No.  4:25-cv-5013-EFS <br><br><br> **ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR FURTHER PROCEEDINGS** |

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), he is hereby substituted as the defendant.

Due to chronic migraine headaches, tension-type headaches, fibromyalgia, major depressive disorder, generalized anxiety disorder with panic attacks, borderline personality disorder, and attention-deficit hyperactivity disorder (ADHD), Plaintiff Chelsea B. claims she was unable to work fulltime during the period of October 11, 2019, through October 20, 2021, and applied for social-security benefits. She appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ improperly analyzed whether Plaintiff met or equaled the listings, improperly assessed Plaintiff's subjective claims, improperly evaluated the medical opinions, and erred at step five as a result of her prior errors. As is explained below, the ALJ erred. This matter is remanded for further proceedings as to the period from October 11, 2019, through October 20, 2021.

## I.     Background

In November 2020, Plaintiff protectively filed applications for benefits under Title 2 and Title 16, claiming disability beginning October 11, 2019, based on the physical and mental impairments noted

above.[3] Plaintiff's claim was denied at the initial and reconsideration levels.[4]

  After the agency denied Plaintiff benefits, ALJ Lori Freund held a telephone hearing on June 3, 2024, at which Plaintiff, a vocational expert, and a psychological medical expert testified.[5]  At the hearing, Plaintiff amended her claims to ones for a closed period of disability from October 11, 2019, through October 20, 2021.[6]

  Plaintiff testified that she went back to work in October 2021.[7] She said that during the closed period she had not worked and was receiving state medical assistance.[8] She said that between October 2019 and October 2021 she had not used any illicit drugs but had "one

---

[3] AR 406, 408, 410.

[4] AR 184, 194, 211, 216.

[5] AR 52-96.

[6] AR 56.

[7] AR 78.

[8] *Id.*

drink every so often."[9] She said that in July 2022 she began using drugs but later had started a medical detox program and was in the program.[10] She said that during the closed period she was depressed due to her father's death and was having at least 3 migraines a week, and they lasted for whole days and sometimes up to 2 days.[11]

Plaintiff testified that she tried a lot of medications but nothing worked until she was approved for Botox.[12] She said that she was having migraine headaches 8 times a month before her treatment with Botox and after the treatment they decreased to 4 times a month and were not lasting as long.[13] She said that it took a while for the Botox to work and that she was only able to take the injections once every three months.[14]

---

[9] AR 79.

[10] *Id.*

[11] AR 80.

[12] *Id.*

[13] AR 80-81.

[14] AR 81.

Plaintiff said that in addition to reducing the frequency and length of her migraine headaches, she also had less anxiety because she did not fear having a migraine attack when out in public.[15] Before her migraines were controlled, she would have panic attacks when she went to appointments where she would have rapid heartbeat, nausea, sweating, and racing thoughts.[16] When she had a migraine, she would be extremely sensitive to light and sound and would get nauseous.[17] When she had a migraine she would have to put a mask over her face and would take Fioricet, which would help if she took it quickly enough.[18] She would lie down and hope to be able to sleep until the migraine passed.[19]

---

[15] AR 81-82.

[16] AR 82.

[17] AR 84.

[18] *Id.*

[19] *Id.*

Plaintiff said that she had days where she woke with pressure behind her eyes and dizziness that preceded a migraine.[20] She said that on days when she was not having a migraine she was able to attend appointments and do household chores.[21]

After the hearing, the ALJ issued a decision denying benefits.[22] The ALJ found Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[23] As to medical opinions: the ALJ found:

- The opinions of medical expert Michael Greenberg, PsyD, to be persuasive.

- The opinions of state agency evaluator, Jon Anderson, PhD, PhD, to be generally persuasive.

---

[20] AR 85.

[21] *Id.*

[22] AR 20-46. Per 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[23] AR 30-35.

- The opinions of state agency evaluator Renee Eisenhauer, PhD, to be unpersuasive.

- The opinions of state agency evaluators Robert Stuart, MD and Charles Lee, MD, to be persuasive.

- The opinions of examining sources N.K. Marks, PhD, and David Morgan, PhD, to be unpersuasive.

- The opinions of examining source Ronald Page, PhD, to have no probative value.

- The opinions of reviewing source Janis Lewis, PhD, to be unpersuasive.

- The opinions of Bruce Tapper, PhD, to be unpersuasive.[24]

As to the sequential disability analysis, the ALJ found:

- Plaintiff met the insured status requirements through December 31, 2024.

- Step one: Plaintiff had not engaged in substantial gainful activity since July 31, 2019, the alleged onset date.

---

[24] AR 36-38.

- Step two: Plaintiff had the following medically determinable severe impairments: migraines, fibromyalgia, major depressive disorder, generalized anxiety disorder with panic features, borderline personality disorder, and ADHD.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments and considered 11.02, 14.09, 12.04, 12.06, 12.08, and 12.11.

- RFC:  Plaintiff had the RFC to perform light work with the following exceptions:

> [Plaintiff] could lift and carry up to 20 pounds occasionally and up to 10 pounds frequently. The claimant could stand and walk for at least six hours in an eight-hour workday and sit for at least six hours in an eight-hour workday. The claimant should avoid climbing ladders, ropes, and scaffolds. The claimant should avoid concentrated exposure to noise above office level, excessive vibration, fumes, odors, dusts, gases, and airborne particulates. The claimant should avoid all exposure to unprotected heights and should avoid concentrated exposure to moving mechanical parts or the operation of heavy machinery. The claimant is limited to simple instruction, with occasional changes in a work setting, and should avoid any type of fast-paced, assemblyline work. The claimant should avoid working with the general public, and could have occasional interaction with coworkers and

supervisors, but should avoid any type of tandem tasks performed.

- Step four: Plaintiff has no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as marker (DOT 209.587-034), router (DOT 222.587-038), and a routing clerk (DOT 222.687-022).[25]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[26]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[27] and such error

---

[25] AR 26-39.

[26] AR 1-6, ECF No. 1.

[27] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

impacted the nondisability determination.[28] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[29]

_____

[28] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[29] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

# III.   Analysis

Plaintiff initially argued the ALJ erred in not obtaining a medical opinion regarding whether Plaintiff equaled Listing 11.02; erred by not properly evaluating Plaintiff's testimony; erred by not properly assessing the medical opinions; and erred at step five as a result of the prior errors.[30] The Commissioner argues that the ALJ was not obligated under SSR 17-2P to call a medical expert regarding equivalency under Listing 11.02 and otherwise properly evaluated Listings 11.02; properly evaluated Plaintiff's testimony; and properly considered the medical opinions.[31]  As is explained below, the ALJ's analysis contains consequential error, and the case should be remanded for further proceedings to develop the record.

## A.   Step Three: Plaintiff established consequential error.

Plaintiff contends the ALJ failed to provide substantial evidence to support the finding that Plaintiff did not equal Listing 11.02. The Court agrees.

---

[30] ECF No. 6.

[31] ECF No. 7.

1.  <u>Standard</u>

The Listings set forth by the Commissioner "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'"[32] At step three of the sequential evaluation, Plaintiff bears the burden of demonstrating that her impairment meets or equals a Listing.[33]

If a claimant meets all of the listing criteria, she is considered disabled at step-three. A claimant who does not meet the listing criteria may still be considered disabled at step-three if her impairment(s) medically equal a listed impairment.[34] Medical equivalence can be established three ways, one of which is:

> If an individual has an impairment that is described in the listings, but either:

---

[32] *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citations omitted).

[33] *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

[34] Soc. Sec. Ruling 17-2p. *See also Sullivan*, 493 U.S. at 530 (requiring a claimant to show that the impairment meets (or medically equals) all of the specified medical criteria, not just some of the criteria).

a. the individual does not exhibit one or more of the findings specified in the particular listing, or

b. the individual exhibits all of the findings, but one or more of the findings is not as severe as specified in the particular listing,

then we will find that his or her impairment is medically equivalent to that listing if there are other findings related to the impairment that are at least of equal medical significance to the required criteria.[35]

The ALJ is obligated to consider the relevant evidence to determine whether a claimant's impairments meet or equal one of the specified impairments set forth in the listings.[36] Generally, a "boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not [meet or equal a listing]."[37]

---

[35] *Id.*

[36] *Lewis v. Apfel,* 236 F.3d 503, 512 (9th Cir.2001); 20 C.F.R. § 416.920(a)(4)(iii).

[37] *Lewis,* 236 F.3d at 512; *see also Marcia v. Sullivan,* 900 F.2d 172, 176 (9th Cir.1990) (noting that the ALJ's unexplained finding at step three was reversible error).

SSR 19-4p offers policy interpretation in evaluating cases involving a primary headache disorder. The Ruling provides:

> *4. What are the ICHD-3 diagnostic criteria for migraine without aura?*
>
> The ICHD-3 diagnostic criteria for migraine without aura are headaches not better accounted for by another ICHD-3 diagnosis and at least five headache attacks satisfying the following criteria:
>
> - Lasting 4 to 72 hours (untreated or unsuccessfully treated); and
> - At least two of the following four characteristics:
>   - Unilateral location;
>   - Pulsating quality;
>   - Moderate or severe pain intensity; or
>   - Aggravation by or causing avoidance of routine physical activity (for example, walking or climbing stairs); and
>
> - During headache, at least one of the following:
>   - Nausea or vomiting, or
>   - Photophobia and phonophobia.[38]

The Ruling then provides further that a primary headache disorder be evaluated under the Listing of Impairments as follows:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we may find that

---

[38] DI 24580.035 SSR 19-4P: Titles II and XVI: *Evaluating Cases Involving Primary Headache Disorder*, SSA POMS DI 24580.035.

a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.

Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.[39]

Listing 11.02 provides that an individual shall be found disabled due to epilepsy if the following may be shown:

**11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:**

A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).  OR

B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).  OR

C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

---

[39] *Id.*

1. Physical functioning (see 11.00G3a); or
2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
3. Interacting with others (see 11.00G3b(ii)); or
4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
5. Adapting or managing oneself (see 11.00G3b(iv)).

OR

D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

1. Physical functioning (see 11.00G3a); or
2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
3. Interacting with others (see 11.00G3b(ii)); or
4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
5. Adapting or managing oneself (see 11.00G3b(iv)).

2.    <u>The ALJ's consideration of Listing 14.09</u>

The ALJ articulated her consideration of Listing 11.02 as follows:

To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: a detailed description from an acceptable medical source of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the

primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations). To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B. In addition, we consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. (SSR 19-4p) Nevertheless, there is no evidence that the claimant's primary headache disorder medically equals a listing, either individually or in combination with another impairment. In this case, the claimant's medical evidence of record does not support finding any marked limitations. As stated at the hearing by Dr. Greenberg, the impartial medical expert, the claimant's mental status exams support finding no greater than a moderate limitation in any area of functioning (Hearing Testimony).[40]

3.  <u>Relevant Medical Evidence</u>

The medical record reflects that Plaintiff suffered from migraine headaches without aura, which were diagnosed as not intractable until

---

[40] AR 27.

October 2019, when they were diagnosed as intractable due to a worsening in the severity of symptoms.[41]

On October 11, 2019, Plaintiff presented to her primary medical source, Carmen Ehlers, MD, at Kadlec Family Medicine Clinic.[42] Plaintiff's medical history noted a past diagnosis of chronic migraine without aura, not intractable; and chronic tension-type headache, not intractable.[43]

On October 28, 2019, Plaintiff presented to neurologist Fei Pan, MD, of Kadlec Neurology Clinic on the referral of Carmen Ehlers for

---

[41] Status migrainosus or intractable migraine is a migraine attack that lasts longer than 72 hours. Symptoms of a migraine, like throbbing head pain, are usually more severe than expected. It is also associated with increased symptoms of light and sound sensitivity, nausea and vomiting. *Status Migrainosus: What It Is, Causes, Symptoms & Treatment.* www.clevelandclinic.org. (last viewed July 31, 2025).

[42] AR 726-730.

[43] AR 727.

treatment for migraine headaches.[44] Dr. Pan noted that he reviewed Plaintiff's prior treatment notes with Dr. Washington and noted that in the past Plaintiff had reported at least one tension headache a week lasting 1-2 hours, as well as at least 2 migraines a month.[45] Due to the recent death of her father and other stressors, Plaintiff's headaches had increased to at least 20 headaches per month with 4-6 migraines per month, lasting from 5-6 hours, up to 3 days.[46] Plaintiff was reporting partial improvement with Fioricet and Imitrex, and had in the past tried and failed Keppra, zonisamide, propranolol, and topiramate.[47] Dr. Pan assessed intractable chronic migraine, and recommended limiting sumatriptan and Fioricet due to the possibility of rebound headaches, and adding Aimovig.[48]

---

[44] AR 722-726.

[45] AR 722.

[46] *Id.*

[47] *Id.*

[48] AR 725.

On January 30, 2020, Plaintiff presented to Dr. Pan for follow-up for migraine headaches.[49] Dr. Pan noted that Plaintiff's insurance had approved Emgality but not Aimovig and that with Emgality Plaintiff was experiencing mild improvement but continued to experience daily headaches and migraines up to 6 days a month.[50] Plaintiff was diagnosed with an intractable chronic migraine.[51]

On May 15, 2020, Plaintiff presented to Dr. Pan via telehealth visit for follow-up for migraine headaches.[52] Dr. Pan noted that Plaintiff had previously tried and failed topiramate, propranolol, Keppra, and zonisamide for intractable migraine headaches associated with light and sound sensitivity and nausea that required her to turn

---

[49] AR 865-868, 716-719.

[50] AR 865-866.

[51] AR 868, 719.

[52] AR 860-863.

off sound and light and close her eyes.[53] Plaintiff reported some benefit after her third month of Emgality.[54]

On August 24, 2020, Plaintiff presented to Dr. Pan via telehealth visit for follow-up for migraine headaches.[55] Dr. Fei noted that Plaintiff had lost her insurance and was not able to fill her prescription for Emgality but had started retaking it once her insurance was restored.[56] Dr. Pan noted that Plaintiff's treatment record indicated a history of 4-6 migraines her month, which lasted from 5 hours to 3 days, and that with Emgality the migraines were reduced to 4 migraines per month.[57] Dr. Pan diagnosed intractable migraine headaches and noted a plan to continue Emgality, with sumatriptan at night and Fioricet as needed.[58]

---

[53] AR 861, 863.

[54] AR 861.

[55] AR 845-848.

[56] AR 848.

[57] AR 846.

[58] AR 848.

On December 15, 2020, Plaintiff presented to Dr. Pan via telehealth visit for follow-up for migraine headaches.[59]  Plaintiff reported that she had started taking Emgality but it was not working and she was having trouble giving herself the injections.[60] Plaintiff reported needing to use Fiorecet twice a week for intractable migraines, with pressure behind her eyes, light and sound sensitivity, and nausea.[61] Dr. Fei noted that Plaintiff had tried and failed topiramate, propranolol, Keppra, zonisamide, and Emgality for intractable headaches and that his plan was to recommend Botox with sumatriptan nightly and Fioricet as needed.[62]

At a February 1, 2021 office visit with Dr. Pan, Plaintiff reported improvement after Botox injection, with reduction to 8 migraines a month, rather than 3-4 migraine days a week.[63] On March 24, 2021,

---

[59] AR 840-844.

[60] AR 841.

[61] *Id.*

[62] AR 844.

[63] AR 685-686.

Plaintiff presented to Dr. Pan for a Botox injection.[64] Plaintiff reported significant improvement following a Botox injection on December 23, 2020.[65] After injection ,her headaches had been reduced from 6 headaches and 3-4 migraines per week to 7 migraines  per month.[66]

On August 16, 2021, Plaintiff presented to Dr. Pan for follow-up.[67] Dr. Pan noted that Plaintiff started treatment for migraine headaches with Botox on December 23, 2020, and reported significant improvement of headaches.[68] Plaintiff reported that after Botox treatment her migraine headaches had been reduced to 5 days per month.[69]

### 4.   Analysis

The ALJ's articulated reasoning regarding Listing 11.02 is not supported by substantial evidence.  The ALJ did not appear to

---

[64] AR 831-832.

[65] AR 831.

[66] AR 832.

[67] AR 910-911.

[68] AR 911.

[69] *Id*.

understand the nature of Plaintiff's migraine headaches.  Initially, the Court notes that while the ALJ has enumerated the criteria to be used in evaluating headaches such as "the need for a darkened and quiet room, having to lie down without moving,"[70] she has not actually gone on to articulate any actual consideration of the factors.  As an example, the criteria just cited regarding photophobia was not discussed in any manner in the ALJ's consideration of Listing 11.02.  Additionally, in her formulated RFC the ALJ has included provisions limiting sound, vibration, dust, and noise but failed to make any provision for limitation regarding lights.[71]  This is consequential because photophobia (light sensitivity) is one of the most common side effects of migraine headaches.[72] Plaintiff's medical records clearly establish that she suffered from both photophobia and phonophobia during migraine

---

[70] AR 27.

[71] AR 29-30.

[72] *Photophobia (Light Sensitivity) and Migraine* | American Migraine Foundation, www.americanmigrainefoundation.org. (last viewed July 31, 2025).

episodes.[73] Moreover, it was Plaintiff's testimony that during a migraine she was extremely sensitive to light and needed to cover her eyes and lie down.[74]

The ALJ's failure to discuss any of the factors set forth in Listing 11.02 is compounded by the fact that the only actual evidence cited by the ALJ regarding migraine is the testimony of the psychological medical expert, Dr. Greenberg.[75]  Dr. Greenberg is not qualified to render any opinion as to the effects of any physical condition and would not be able to render any meaningful testimony as to Plaintiff's physical functioning, the side effects of medication and treatment, the need for dark or quiet space, or the effects of nausea and vomiting.

In short, the ALJ failed to articulate any valid consideration of the factors provided for in SSR 19-4p and Listing 11.02.

The Commissioner asserts that the ALJ was not obliged under SSR 17-2p to call a medical expert to testify regarding equivalency to

---

[73] AR 841, 8612, 863.

[74] AR 84.

[75] AR 27.

Listing 11.02.[76] While the Commissioner is correct that such testimony was not required pursuant to SSR 17-2p, he has failed to consider that the testimony was required pursuant to SSR 19-4p once Plaintiff met the threshold to establish a primary headache disorder that might equal Listing 11.02.  While a simple migraine disorder without aura might not meet the threshold to require medical expert testimony as to whether it would equal the listing, an intractable migraine (status migrainosus) or a migraine with aura does, by its nature, require such expert testimony or opinion.

SSR 17-2p provides that while an ALJ may find that a claimant meets a listing, medical expert testimony is required to establish equivalency.  Moreover, SSR 19-4p required the ALJ to properly develop the record to consider whether Plaintiff's intractable migraine headaches equaled the listing.

The Court concludes that remand is warranted for the ALJ to properly develop the record and to call a medical expert to testify at the

---

[76] ECF No. 7.

hearing as to whether during the closed period Plaintiff's status migainosus equaled Listing 11.02

## B.    Medical Opinions and Symptom Reports:  This issue is moot.

Plaintiff argues that the ALJ failed to provide valid reasons for discounting his subjective complaints.  Because the Court has remanded the case with direction that the ALJ re-evaluate the medical opinions and Plaintiff's impairments, the ALJ will be required to re-evaluate Plaintiff's symptom reports.  These issues are therefore moot.

## C.    Step Five:  Plaintiff established consequential error.

Plaintiff argues the ALJ's step five finding was flawed due to errors in considering the medical opinion evidence and in evaluating Plaintiff's subjective complaints.  Because Plaintiff established consequential error in considering the medical evidence, he has established error at step five.

## D.    Remand for Further Proceedings

Plaintiff submits a remand for payment of benefits is warranted. The decision whether to remand a case for additional evidence, or

simply to award benefits, is within the discretion of the court."[77] When the court reverses an ALJ's decision for error, the court "ordinarily must remand to the agency for further proceedings."[78]

The Court finds that further development is necessary for a proper disability determination for the closed period from October 11, 2019, through October 20, 2021. Here, it is not clear whether Plaintiff equaled Listing 11.02, or what, if any, additional limitations are to be added to the RFC, such as limitations to exposure to light.

## IV. Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

---

[77] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*, 761 F.2d 530 (9th Cir. 1985)).

[78] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke* 379 F.3d at 595 ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).

1.    The ALJ's nondisability decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner of Social Security for further development of the record as to the period from October 11, 2019, through October 20, 2021.

2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 6 and 7**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 21st day of August 2025.

_____
EDWARD F. SHEA
Senior United States District Judge